In Re: REPORT OF GRAND JURY; MOTION OF HARDY C. GRAVES TO EXPUNGE FROM THE RECORDS OF THE COURT THE SO CALLED REPORT OF THE GRAND JURY FILED OCTOBER 29, A. D. 1941.

11 So. (2nd) 316  June Term, 1942
January 4, 1943  En Banc

*Tilman & Henderson* and *Sam Bucklew,* for appellant.

*J. Rex Farrior,* for appellee.

TERRELL, J.:

In October, 1941, the grand jury for Hillsborough County filed a report in the Circuit Court in which it made findings of fact and recommended to the Governor that Hardy C. Graves, a constable in District Three of said county be removed from office. Graves promptly moved to expunge the report from the record. His motion was overruled; hence this appeal.

Some question has been raised as to the regularity of this procedure but Section Four of the Declaration of Rights concludes that matter in favor of Graves. This appears to be the first instance of such a proceeding in this State but appellant cites numerous cases in which a similar proceeding was fol-

lowed in other jurisdictions. Ex parte Robinson, 231 Ala. 503, 165 So. 582; In re Report of Grand Jury of Baltimore City, 152 Md. 616, 137 Atl. 370; In re Grand Jury Report, 204 Wis. 409, 235 N. W. 789, and many others.

Several questions are argued but they all charge error in denying the motion to expunge the Grand Jury Report. The answer to this question turns on that of whether or not the report was within the compass of the Grand Jury's power as defined by law.

Summarized, the report finds from evidence taken that Graves (1) permitted gambling and gambling houses to be conducted within his district and made no attempt to prosecute the operators. (2) To assist him in the conduct of his office he appointed persons of questionable character, one of whom had a criminal record and others had unsavory connection with gambling establishments. (3) He used his official position to intimidate the operators of certain businesses and compel them to patronize businesses that he favored. (4) He employed unnecessary deputies and failed to pay them thereby causing them to resort to means that were questionable to supplement their income. That part of the report most seriously assailed is as follows:

"We have unanimously elected to ask for the immediate removal of Constable Graves rather than for prosecution chiefly because we are interested in the proper operation of that office in the future rather than any punishment of the individual. Furthermore, we realize that the chances of conviction of a law enforcement officer for nonfeasance, misfeasance and malfeasance are small and every effort in this State, which has ever been heard of by any member of this Jury, has resulted only in expense and delay. We further recognize and submit that there are many acts of misconduct which warrant the removal of an officer for which he might not be prosecuted, much less convicted."

The defendant in error contends that this language was prompted by the fact that in April, 1938, Graves was indicted by a grand jury and had never been brought to trial, that eighteen months later a second grand jury called attention to the indictment and that the report complained of was the

third time the grand jury had been called on to investigate Graves' official conduct. It appears that the third investigation was made at the request of the Governor, who called Graves before him, gave him a hearing, and suspended him, the hearing and suspension having taken place prior to the time the motion was made to expunge the report.

Trial by jury is by general consent a common law creation and does not prevail in countries which adopted the civil law though there are evidences of such an institution in Greece and Normandy long before it was adopted in England. The jury system was developed in England to aid the court in arriving at the factual truth of the controversy through which our law of evidence was derived. The same jury was at first the accusor and trier of the facts; it was the successor to the early more or less barbarous systems of trial by Corsned, Compurgation, Inquest, Wager, and Ordeal, all of which were predicated on the theory that God would miraculously intervene to save the innocent. All the early cases speak of twelve as composing the jury because as Lord Coke said, the law delighteth in the number twelve and that it is much respected in holy writ, as twelve apostles, twelve stones, twelve tribes, etc.

Few legal institutions have experienced a more remarkable evolution than the jury system. For a long time there was no distinction between the grand and petit or trial jury though the former seems to have antedated the latter and is one of our most ancient institutions. The grand jury as we understand it took shape under Edward the third, about A. D. 1368, though its use in some form had been employed at a much earlier date. It took its name from the fact that it was taken from the county at large, in contrast to one taken from the hundred. The petit jury is said to have been carried to England by the Normans where it has been employed for a long time. The grand jury was at first an instrument of the crown but in the process of its evolution, it became an independent instrument whose function was to uphold the liberty of the people and act as a buffer between them and the crown.

At the time the grand jury was incorporated into the law

of this country, it had become strictly an inquisitiorial body and except in special cases provided by the Constitution, no one could be tried for felony except he be previously indicted by a grand jury. Its function now depends on the law of the particular forum, some states being much broader than others. In Florida, the grand jury system was derived from the common law, Cotton v. State, 85 Fla. 197, 95 So. 668, but has been enlarged by statute.

Section 95 of the Criminal Procedure Act defines its duties as to crimes and is as follows:

"The Grand jurors shall inquire into every offense triable within the county for which any person has been held to answer, if an indictment has not been found or an information filed for such offense, and all other indictable offenses triable within the county which are presented to them by the prosecuting attorney or otherwise come to their knowledge."

When selected as provided by Section 80 of the Criminal Procedure Act, they are required to take the oath prescribed by Section 89, as follows:

"You, as grand jurors for the body of this county of . . . do solemnly swear (or affirm, as the case may be) that you will diligently inquire, and true presentment make, of all such matters and things as shall be given you in charge; the counsel of the State of Florida, you fellows and your own, you shall keep secret, unless required to disclose the same by some competent court; you shall present no man for envy, hatred, or malice, neither shall you leave any men unpresented for love, fear, favor, affection, reward, or hope thereof, but you shall present things truly as they come to your knowledge, according to the best of your understanding So help you God."

After the oath is administered, the court is required to "charge them concerning their duties." Section 8215, Compiled General Laws of 1927, provides that the grand jury "may present every offense against the penal laws of this State whether any specific punishment is pointed out or not." Other provisions extend their powers and duties but they are not pertinent to this case.

The oath as here quoted was in substance the same oath that was administered to the jury in the time of Bracton and the statutes limiting their power were in the main the common law of that period. The charge "concerning their duties" must of course be encompassed within the oath and the statutes but it is well known that by their charge trial courts have directed the grand jury to investigate every offense that affected the morals, health, sanitation, and general welfare of the county. The charge also goes to the investigation of county institutions, buildings, offices, and officers and directs them to make due presentment concerning their physical, sanitary, and general condition. The grand jury is in other words the guardian of all that is comprehended in the police power of the State. To "inquire of all such matters and things as shall be given you in charge" and "present every offense against the penal laws of the State whether any specific punishment is pointed out or not" warrants this.

This interpretation clothes the grand jury with broad inquisitorial power but no broader than judges have construed them to have since the law was promulgated. It would be a strange anomaly to hold that their power to indict or to recommend did not comport with their power to investigate. There are some things however that are not within the category of grand jury powers. They will not be permitted to single out persons in civil or official position to impugn their motives, or by word, imputation, or innuendo hold them to scorn or criticism. Their investigation must be directed to detecting unlawful offenses; they will not be permitted to become the tool of blocs and groups to pry into personal affairs or to oppress some one. Neither will they be permitted to speak of the general qualification or moral fitness of one to hold an office or position but whether or not a county office is being conducted according to law and good morals is at all times within the jurisdiction of the grand jury to investigate. When they find that the law has been violated, it is their duty to indict but when they find charges made to be without foundation, it is as much their duty to exonorate as it is to indict in the first instance. It is by dispatching in a fair and impartial way matters brought

to their attention that the grand jury becomes the buffer between the free citizen and arbitrary power.

We do not find that the grand jury report brought in question violates this rule except as to certain portions of the part quoted. It does not assail the character or qualification or assault the motives of Mr. Graves. It does not hold him up to scorn or ridicule but deals exclusively with his conduct as a county official and that on the basis of evidence taken. All that part of the report quoted beginning with the word "furthermore" on the fifth line and ending with the word "convicted" on the last line is improper, has no place in the report and is regarded as stricken.

The holder of public office in this country is clothed with a limited degree of sovereignty; in other words an attribute inherent in the people is transferred to one of its citizens to be exercised according to the terms of the trust imposing it and not as he would a chattel or a business that he acquires by out right purchase. Both the office and the conduct of the holder are public property that may be withdrawn at any time the trust vesting it is abused. In a democracy, it is not possible for the people individually to know when such trusts are being abused so one of the agencies provided to represent and report when abuses are committed is the grand jury. It is a means whereby the people participated directly in the administration of their business and aids to a knowledge of why the grand jury has become such an important agency among free peoples. It could never attain such an important status in the totalitarian state.

But appellant contends that the action of the grand jury in this case deprives him of the right to be heard in his defense the right to face his accusers and to answer the charge against him. The answer to this question is that grand jury investigations are always ex parte and the person investigated is never accorded the right to be heard before them. If he is indicted, he is accorded the right to be heard before the trial court. In this case it appears that the official conduct of appellant was investigated at the request of the Governor and when completed, the grand jury reached the conclusion that suspension from office was more consonant

with the gravity of the offense than indictment and so recommended.

The Governor is the executive officer of the State and is required to, enforce the law. He is authorized to suspend certain state and county officers for "malfeasance or misfeasance of neglect of duty in office, for the commission of any felony, or for drunkenness or incompetency." He may or may not accord them a hearing before suspension. If he elects to employ a grand jury investigation to aid him in his judgment, he certainly has a right to do so. In fact we know of no better source for aid that he could resort to. The grand jury is of the people and for the people; they have preserved it in the Constitution, Section 10, Declaration of Rights, and Section 28, Article V. It is one of the means provided for the people to participate in popular government and its primary function is to preserve personal and property rights. On the other hand if the grand jury makes an investigation on its own initiative and reaches the conclusion that the circumstances warrant suspension rather than indictment or it may be both, it would be derelict in its duty if it did not bring the matter of suspension to the attention of the Governor. To hold that such a finding should be squelched or that they should keep silent about it would be contrary to its purpose and would give the green light to crime and official depravity.

Every person who assumes the duties of public office does so with the knowledge that his official conduct is constantly under scrutiny by the public. For the purpose of detecting abuses on the trust so imposed, the law has erected what may be termed a three way switch, one of which leads to the Governor's office, one to the grand jury room, and one to the primary. Rectitude of official conduct is the only refuge from a plethora of light from these sources. At any rate, it is idle for one to think that he can administer the affairs of his office with one strabismic eye on the grand jury and the Governor and the other in pursuit of a course of conduct contrary to public morals. Public office is the most important trust democratic government vests in the citizen. It is important because the integrity level of the political unit rises and falls with that of its official leadership. The honest

officer is not averse to having the light turned on and if he objects, there arises a shadow of suspicion that may prompt a grand jury inquisition.

We do not overlook appellant's contention that this procedure substitutes grand jury rule for the orderly processes of the law. Neither do we overlook the fact that the record in this case shows that he did not raise this contention until after the grand jury called 'strike" on him three times and the Governor called "out." The Constitution attaches significance to the action of the grand jury and as to that of the Governor it had the effect of transferring jurisdiction of the cause to the Senate. The evidence taken and on which the Governor acted is not before us but if it was, it would be improper for us to review it since that will be a matter for the Senate at its next session.

We do not find that the grand jury exceeded its jurisdiction so the judgment appealed from is without error and is affirmed.

Affirmed.

WHITFIELD, J., concurs.

CHAPMAN and THOMAS, JJ., concur specially.

BROWN, C. J., concurs in conclusion.

BUFORD and ADAMS, JJ., dissent.

CHAPMAN, J., concurring specially:

The practice has come into existence for grand juries to investigate, make inquiry, hear testimony, and make reports, without apparent statutory authority, on matters affecting the public interest and general welfare. When such activities are in good faith made and limited to the channel of the public interest and general welfare as differentiated from investigations prompted by private interests or arbitrary motives, then such written presentation should be sustained. The tremendous power by law conferred upon a grand jury should not under any condition or circumstance become a vehicle of oppression or the instrumentality whereby the group in control should by their action through the grand jury promote private interests contrary to the interest of the public and general welfare. In the absence of a statute con-

trolling the subject, I have concluded that it has not been made to appear that the challenged report is inimical to the public interest and general welfare and for this reason I concur in the majority opinion and judgment of Mr.. Justice TERRELL.

THOMAS, J., concurring specially:

It is my opinion that the case is not properly before this Court but a majority of the Court having a contrary view I concur in the opinion of Mr. Justice TERRELL.

BUFORD, J., dissenting:

I am unable to concur in the opinion prepared for the Court in this case by Mr. Justice TERRELL.

From a study of three cases cited in support of the procedure here adopted in invoking the jurisdiction of this Court, I find that not only was the procedure approved in those cases but in all three cases the extra judicial report of the grand jury was ordered expunged. In the case of Ex Parte Robinson, 231 Ala. 503, 165 So. 582, the Court said:

"On the other hand, where the question has arisen on direct attack, as here, with one accord, the cases hold that the officer when he is thus criticized has the right in such a proceeding as this to have the report expunged. In one case it is thus expressed: 'While it may be observed that the court has tolerated, rather than sanctioned, such presentment of things general, yet the grand jury should never, under cover of a presentment, present an individual in this manner for, if it have legal evidence of the commission of the crime, it should find an indictment against him upon which he could be held to answer, and, if it have no such evidence, it ought, in fairness, to be silent.' In re Gardiner, 31 Misc. 364, 64 N.Y.S. 760, 762. This is quoted in Re Wilcox, 153 Misc. 761, 276 N.Y.S. 117, at page 125, with quotations to a like effect from many other cases. It was also said: 'It cannot be that it was ever contemplated that this body created for the protection of the citizen was to have the power to set up its own standards of public or private morals, and to arraign citizens at the bar of public opinion, without responsibility for its abuse of that power, and without giving to the citizen

the right to a trial upon the accusations.' All this in respect to public officers. The dissenting opinion to the same effect in Jones v. People, 101 App. Div. 55, 92 N.Y.S. 275, has been approved in the later cases decided by that court. In re Osborne, 68 Misc. 597, 125 N.Y.S. 313, 318, it is said: 'So long as they are confined to matters of general interest they are regarded as harmless, even though a waste of time and effort, and after the ephemeral motive of the day has passed they were allowed a peaceful rest. But it is very different when the motives and conduct of the individual are impunged, and he held to reprobation, without an opportunity to defend or protect his name and reputation.' The motion was by a district attorney. And, likewise, such a motion was sustained in many cases by officers thus criticized—In re Heffernan (Co. Ct.) 125 N.Y.S. 737, In re Woodbury (Sup.) 155 N.Y.S. 851, In re Crosby, 126 Misc. 250, 213 N.Y.S. 86, and in People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 367, where it is said in part: 'An indictment may be challenged—even defeated. The presentation is immune. It is like the 'hit and run' motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed.' Also In re Funston, 133 Mis. 620, 233 N.Y.S. 81; State v. Bramlett, 166 S.C. 323, 164 S.E. 873, 875. In the latter case the court observed: 'But a grand jury transcends its power and exceeds its duty when in its presentment . . . it presents an officer or person by name, and with words of censure and reprobation, without presenting him for indictment.' A vast number of cases are to the same effect. In re Grand Jury Report, 204 Wis. 409, 235 N.W. 789; In re Report of Grand Jury, 152 Md. 616, 137 A.370. In this case there is a review of the cases cited above, and many others approved the principle. Bennett v. Kalamazoo Circuit Judge, 183 Mich 200, 150 N.W. 141, Ann. Cas. 1916E, 223, 28 Corpus Juris 799, and many textwriters are quoted to the same effect in the Wilcox case, supra."

Each and every of the cases cited by the Supreme Court of Alabama, supra, support the enunciation of that Court. I have not found, nor have I been cited, any case in point in

this Country where the contrary was held. See 28 C.J. 799, Sec. 91; 24 Am. Jur. p. 859, ...... Sec. 36, and cases there cited.

In my humble opinion the unlawful action of the Grand Jury in this regard is not made tenable because of the fact that there is some inference in the record to the effect that the Grand Jury was directed by the Governor to make investigation of Graves. This is true because the Grand Jury is a component part of the judicial system of our State and the Governor as the Chief Administrative Officer has no power or authority to direct the grand jury in the exercise of its functions. Article II of our Constitution provides:

"The powers of the government of the State of Florida shall be divided into three departments; Legislative, Executive and Judicial; and no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this Constitution."

Likewise, it was not within the legal power, duties or functions of the grand jury to advise the Governor as to what, if any, action he should take in regard to any of his executive or administrative duties.

It, therefore, follows that this recommendation of the grand jury was without authority of law, was of no force and effect, was in no way binding upon the Governor and violated Article II of the Constitution, supra. It is also violative of the due process clause of both the Federal and State Constitution because its purpose was to deprive Graves of his office by a method and means wherein he was not vouchsafed by law of any opportunity to be heard in his own defense. The mere fact that the Governor might have granted Graves a hearing on the charges contained in the Report does not satisfy the due process provisions of our Constitution, because if the Governor did grant such a hearing it was a matter of grace and not a matter of right.

If either the first or the third charge as summarized in Mr. Justice TERRELL's opinion were true, then Graves was guilty of a criminal offense for which he could have been indicted, or informed against, and could have been tried by a jury under the rights guaranteed to him by the Constitution.

On the other hand, if he was only guilty of that conduct which is summarized in charges 2 and 4, proof of the allegations of those charges would hardly be sufficient to constitute grounds for suspension from office.

It appears to be the theory, upon which all the cases hereinbefore referred to were decided, that it is beyond the province of a grand jury to present an officer or other person by name and with words of censure and reprobation without presenting him for indictment, because to do so is to besmirch and hold to reprobation the accused without opportunity to defend or protect his name and reputation.

ADAMS, J., concurs.